**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

**KELVIN THOMAS, on behalf of himself**
**and others similarly situated,**

**Plaintiff,**
**v.**

**BACKGROUNDCHECKS.COM, (in its own**
**name and trading as e-**
**backgroundchecks.com),**

**Defendant.**

Civil Action No.  3:13CV29

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL**
**OF CLASS ACTION SETTLEMENT, APPLICATION FOR SERVICE AWARD TO**
**THE CLASS REPRESENTATIVE, AND APPLICATION FOR AWARD OF**
**ATTORNEYS' FEES**

Plaintiff Kelvin Thomas (hereinafter referred to as "Plaintiff" or "Class Representative"),

on behalf of himself and the Class, respectfully submits this memorandum in support of final

approval of the class settlement reached in this case and applies for a service award for his role in

prosecuting this action. Class counsel also apply for an award of attorneys' fees and for the

reimbursement of their out-of-pocket expenses incurred in furtherance of litigating this matter to

the successful result now before this Court for final approval.

## I.        INTRODUCTION

The Court has preliminarily approved this nationwide class action filed under the Fair

Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA").  Plaintiff's Third Amended Class

Complaint names Kelvin Thomas as Plaintiff. Backgroundchecks.com (in its own name and

trading as e-backgroundchecks.com) ("BGC") is joined as the Defendant.

The settlement represents an excellent resolution for numerous reasons. First, the settlement achieves a cessation of the practice targeted by the litigation, namely BGC's failure to provide contemporaneous notice to consumers who are the subject of the background checks that it sells to employers. If approved, the settlement will assure revisions to BGC's policies and procedures in providing background reports on job applicants to employers, as well as other substantial changes in the website interface with its customers. The settlement thus achieves the kind of settlement injunction that usually would be found in a Federal Trade Commission action. This injunctive relief will impact not only the persons within the defined Settlement Class, but thousands of other consumers who apply in the future for employment and are subject to background reports conducted by this Defendant.

Second, the settlement provides cash compensation to each Settlement Class member through the creation of an $18,000,000.00 Settlement Fund. The value of this aspect of the settlement is underscored by the fact that Class Members will recover these benefits by filing only a simple claim. The Settlement Class also receives the benefit of historical and current BGC reports as well as an expedited dispute process in the case of inaccurate information. For Class Members who suffered from demonstrable inaccuracies and suffered actual damages, they are able to decline payment from the Fund and reserve a claim for actual damages. Agreement § 6.1.3.

Third, the stage of the litigation and sequencing of the negotiations patently demonstrates the arms-length and non-collusive nature of the settlement. The settlement in this case was arrived at only after approximately a year of litigation and a detailed mediation under the close supervision of Rodney Max, a private mediator, and the Hon. David J. Novak, United States

Magistrate Judge. There is no question that negotiations were conducted in an arms-length manner.

For these reasons, and those set forth in greater detail below, the settlement is fair, reasonable and adequate to the Settlement Class and satisfies all of the criteria that courts routinely apply for the approval of class action settlements.

## II.   HISTORY

### A.   The Claim

On January 11, 2013, Tyrone B. Henderson, Sr., Kelvin Thomas, and Ronald Johnson filed an action styled as *Henderson, Thomas, et al. v. Backgroundchecks.com*, Civil Action No. 3:13-cv-029 in the United States District Court for the Eastern District of Virginia, alleging that BGC failed to comply with several provisions of the FCRA.[1]   On February 12, 2015, Kelvin Thomas filed a Third Amended Complaint, alleging that BGC violated section 1681k(a) of the FCRA, relating to the employment background screening procedures of BGC.

The "Settlement Class," as defined in the Third Amended Complaint, means all consumers as defined in Count I of the Third Amended Class Complaint. These consumers make up the Class, and they are all individuals for whom BGC prepared and furnished and employment-purposed consumer report directly to an end-user from January 11, 2011 through August 31, 2014, which contained one or more criminal records. BGC neither (a) sent the person a notice pursuant to 15 U.S.C. § 1681k(a)(1), nor (b) as a matter of procedure, obtained the records from or confirmed the records with a government body (either directly or through others) after receiving the request for the report and before furnishing the report. Based on the records

---

[1]     Mr. Henderson and Mr. Johnson's claims have not been negotiated as part of the Settlement Agreement. Their claims have been dismissed and the resolution of them has been deferred until the resolution of this case. If their cases need to be refiled, they will be brought in the district and division where each of these plaintiffs reside.

maintained by BGC, the parties originally estimated that the Settlement Class would consist of approximately 430,000 separate consumers.   However, after Class Counsel and the Administrator obtained the class list from BGC, the Administrator determined that the class had 408,526 individual members.  (Barkan Decl. ¶ 5).

The only class claim settled, and the only class claim in the Third Amended Complaint, is for a violation of 15 U.S.C. § 1681k(a), which establishes procedures that a CRA must follow when reporting "items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment."  15 U.S.C. § 1681k(a)(1).  In particular, in such circumstances, a CRA shall:

> (1) at the time such public record information is reported to the user of such consumer report, notify the consumer of the fact that public record information is being reported by the consumer reporting agency, together with the name and address of the person to whom such information is being reported; or
>
> (2) maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date. For purposes of this paragraph, items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time of the report is reported.

*Id.*  The provisions of section 1681k(a) are disjunctive, thereby allowing a CRA to comply with either subsection to avoid liability.  Mr. Thomas alleged that Defendant failed to mail him notice "at the time" it furnished consumer reports about him to his employers or prospective employers, claiming that such notices were instead sent in an untimely manner, in violation of §1681k(a). (Third Am. Compl. ¶¶ 31–41, 58.)

BGC denies that it violated the FCRA and contends that it did timely comply with the notice requirement of section 1681k(a)(1) and acted in accordance with industry standard practice. This differing view of the law and the facts was a material divide between the parties.[2]

Liability under the FCRA is not strict and only arises upon a finding of negligence or willful failure to comply.  15 U.S.C. §§ 1681n, 1681o.  Unless there is a finding of a willful noncompliance, Plaintiff (and thus the Class) must establish actual damages.  Statutory and punitive damages are *only* available where there is a willful violation. A class must proceed either on a uniform "actual damages" claim, or it must pursue statutory and punitive damages under the more challenging "willfulness" standard of Section 1681n.  Even though Mr. Thomas has suffered actual damages, they may be difficult to quantify, and thus he has chosen to pursue the latter course with respect to the class claim. This class claim, detailed above, asserts that Defendant willfully violated the FCRA and seeks the recovery of statutory and punitive damages on that basis.

In *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 69 (2007), the Supreme Court considered the standard for whether a defendant "willfully" violates the FCRA, including whether willfulness also includes "recklessness."  *Id.* at 52.  While it held that the former encompassed the latter, the Court also concluded that this willfulness standard is not met "unless the action is not only a violation [of the FCRA] under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  *Id.* at 69.  To overcome this hurdle, it is the plaintiff's burden to prove that a defendant's attempts to comply with the FCRA were

---

[2]     Likewise, Defendant denied that the case was capable of class certification.  Even apart from contested issues of liability and willfulness, the Parties would have engaged in a protracted legal battle over whether the case was even capable of certification in the first instance.

"objectively unreasonable." *Id.* However, to the extent that any violations of the FCRA could be established, Defendant denied that any violations were the result of willful misconduct, the proof of which was essential to the success of the class claim, including under the standards set forth in *Safeco*. Therefore, this was yet another material divide between the parties with respect to the class claim.

## B.     Class Counsel History

Several national class-action law firms, as well as Community Legal Services, Inc. of Philadelphia ("CLS"), have collaborated and pooled resources in order to adequately represent the Plaintiff and the Class against BGC. Prior to the filing of the Third Amended Complaint, there were four named Plaintiffs each with a set of facts, documents, and involvement in the case.  On behalf of each Plaintiff, Counsel propounded and answered written discovery.  Each Plaintiff assisted in the prosecution of the case by participating in answering written discovery and providing testimony under oath at depositions.  Prior to the filing of the Complaint, all counsel had already collaborated and strategized about the appropriate class claims against BGC. BGC itself was somewhat of an unknown because it is a closely held company with unknown resources. BGC's limited resources soon became apparent.  After the lawsuit was filed, BGC's insurance carrier Liberty Mutual Fire Insurance Company brought a declaratory judgment action seeking a declaration that it had no duty to defend or indemnify BGC in this action.  *Liberty Mutual Fire Ins. Co. v. Gen'l Info. Servs. Inc.*, 3:13CV375 (E.D.Va. 2013).[3]  BGC nonetheless retained some of the most capable class action defense attorneys with experience in the FCRA, including the lawyers of Kilpatrick Stockton, LP, and LeClair Ryan PC.

---

[3]     The Court entered judgment in favor of Liberty Mutual and against BGC, which judgment is currently on appeal to the Fourth Circuit.

Early in the case, the Defendant filed a motion to strike or in the alternative, to dismiss to which the Plaintiffs responded with a First Amended Complaint.  Shortly thereafter, the Plaintiffs filed a Second Amended Complaint, and both sides fully engaged in discovery, including issuing third-party subpoenas, scheduling and taking numerous depositions, exchanging thousands of documents, and engaging experts. For the next four months, the Parties were engrossed in discovery.  However, at the same time, counsel because counsel were in frequent contact, the possibility of settlement was also frequently being discussed.

C.     **The Lengthy Mediation**

On August 19, 2013, the Parties agreed to seek a stay all deadlines in order to pursue private mediation. Between November 11, 2013 and June 23, 2014, the Parties engaged in three arms'-length, contentious, lengthy, and complicated in-person mediation sessions with a private mediator, Rodney Max.

On March 14, 2014, the Parties scheduled and attended a formal mediation.  That mediation occurred in Atlanta, Georgia at the office of Kilpatrick Townsend & Stockton, LLP and was supervised by Rodney Max, a private mediator.

Thereafter, the Parties attended a second mediation session with Mr. Max on April 29, 2014 in Atlanta, Georgia. At that mediation session, the Parties made further progress towards resolving their dispute, again discussing the case, their claims, and available defenses.

On June 23, 2014, the Parties conducted a third in-person mediation session with Mr. Max at the offices of Reed Smith LLP in Philadelphia, Pennsylvania. During this session, the Parties reached an agreement in principal to settle the case, but did not finalize the terms of the settlement.

During the last mediation session, the Parties agreed to settle the case in principle. After complete relief for the Class was agreed, the Parties sought the assistance, supervision and judgment of United States Magistrate Judge David J. Novak to complete the negotiation of the terms of the Settlement Agreement. On August 22, 2014, the Court referred the case to Magistrate Judge Novak, who supervised the completion of the negotiation of the Settlement Agreement.

Part of the Agreement included narrowing the Class Claim to be settled, while at the same time preserving the individual causes of action that each of the Plaintiffs have against Backgroundchecks.com. It was agreed that Kelvin Thomas was the only Plaintiff who had a claim against Backgroundchecks.com based on its violation of 15 U.S.C. § 1681k(a)(1).  On February 12, 2015, Plaintiff Kelvin Thomas filed the Third Amended Class Action Complaint.

The settlement of this case took place over many months, with many conversations among counsel both informally and formally, in person, in writing and on the phone.  The settlement was significantly complicated due to the litigation between BGC and its insurance carrier and the uncertainty that brought to the amount of money that could be available to pay the class claims.  The Parties were able to minimize additional complications because Plaintiffs were willing to compromise by refining the claims in order to resolve the section 1681k claims in favor of the class, leaving the other Plaintiffs free to pursue their other claims individually without prejudice.  Even though the Defendant denied all of Plaintiffs' claims and any liability to any putative class member, the Defendant was willing to compromise by agreeing to a cash compensation structure together with meaningful injunctive relief for the class and process changes going forward. Only after months of negotiating each term in the Agreement was a reasonable settlement structure memorialized, endorsed and filed on February 20, 2015.  (78-1).

Only after complete relief for the Class was agreed, the parties negotiated additional terms – claims process, notice, service awards, as well as costs and attorneys' fees. This Settlement is an excellent result for the Class. It provides significant relief, including monetary payment to each Class Member who attests that he or she suffered a reputational injury or an inaccuracy injury, without risking the uncertainty of litigation. Despite the large size of the settlement, there are no attorney, public interest group or government agency (i.e. Attorneys General, Federal Trade Commission) objections. There are only 6 timely opt-outs, or a .0012% opt-out rate.[4]  (Barkan Decl.¶ 13)(Ex. 1).  In addition, there are no objections to the settlement.[5]

**D .**     **The Settlement of the Class Claim**

The Settlement was agreed only after (1) substantive briefing; (2) review of extensive documentation and information produced by Defendant; (3) interviews with and depositions of multiple fact witnesses; and (4) arm's-length, contentious, lengthy, and complicated negotiations that have included three in-person mediation sessions with a professional mediator and the supervision and approval of United States Magistrate Judge Novak.

**1.**     **The Settlement Class.**

Under the Settlement Agreement, the Parties agreed to resolve the claims of the Class of persons defined as follows (the "Settlement Class"):

> All natural persons residing in the United States, any U.S. territory, the District of Columbia, or Puerto Rico who were the subject of one or more consumer reports that BGC prepared and furnished directly to an end-user for its employment purposes during the period from January 11, 2011 to August 31, 2014, which report or reports contained one or more criminal offense records, where BGC

---

[4]     In calculating the opt out rate, Class Counsel assumed the entire size of the class as if all of class members had been successfully found and reached by mail.  However, the opt-out rate relative to the number of class members whose notices were presumed delivered is virtually the same, .0015%
[5]     One Class Member, Victoria McGlothlin, filed a request for permission to speak at the hearing (Doc. 98), which permission was granted by the Court. (Doc. 99.)

neither (a) sent the person a notice pursuant to FCRA § 613(a)(1) [15 U.S.C. § 1681k(a)(1)] nor (b) as a matter of procedure, obtained the records from or confirmed the records with a government body (either directly or through others) after receiving the request for the report and before furnishing the report. Excluded from the Class are any officers, directors, or employees of, any consumer who has previously released his or her claims against BGC, and the Judge overseeing this action.

The Court preliminarily appointed Plaintiff Kelvin Thomas as the Class and undersigned Plaintiff's counsel as Class Counsel for the Class Members.

**2.     The Consideration Provided To The Settlement Class Under The Settlement Agreement**

The Settlement Agreement provides for three types of relief:  money damages, equitable relief and injunctive relief.  The Agreement requires BGC to pay $18 million into a Settlement Fund for the benefit of the Settlement Class, and it therefore provides a substantial monetary recovery for the Settlement Class.  Within 20 days of the effective date, if the Settlement is approved, the $18,000,000 fund will be created by the Settlement Administrator and will pay the claims to the Class Members, the costs of the class notice and administration, as well as attorney's fees and costs and the class representative service award.[6] The remaining funds will be divided between the reputational injury fund and the inaccuracy injury fund. The Settlement Agreement provides that Class Members are required to submit a valid claim form certifying that they are members of either the Reputational Injury Fund or the Inaccuracy Injury Fund. The deadline for submitting a claim form is August 28, 2015.  However, as of this date, the Administrator has received 7800 Claim Forms, or a 2.4% claim rate with approximately six weeks left in the claim period. (Barkan Decl ¶ 16).   After the Class Members have submitted their claim forms, distributions will be made using the following formula:

---

[6]     Pursuant to the Agreement and the Preliminary Approval Order, the Defendant has already funded $1.5 million as an advance on the cost of administration and notice to the Class.

1) Class Members who certify that they are entitled to a Reputational Injury Payment and submit a valid claim form will receive the *greater* of either (a) 100% of the Net Settlement Fund divided by the sum of (i) the number of Reputational Injury Members plus (ii) five times the number of Inaccuracy Injury Members; or (b) the **lesser** of either (i) one third of the Net Settlement Fund divided by the number of Reputational Injury Members, or (ii) 100% of the Net Settlement Fund, divided by twice the total number of Settlement Class Members whose Claim Form the Settlement Administrator has accepted.

2) Class Members who certify that they are entitled to an Inaccuracy Injury Payment and submit a valid claim form will receive the remainder of the Net Settlement Fund after the clearing of all checks that Reputational Injury Members timely deposited or cashed, with that remainder then divided by the number of Inaccuracy Injury Members.

Using these ratios, on a *pro rata* basis, and before deducting any attorney's fees awarded and costs of notice, assuming a ten percent claims rate, with ten percent of claimants reaching the inaccuracy threshold, the Reputational Injury Payment would pay a net of $201.24 per claimant and the Inaccuracy Injury Payment would pay a net of $1,006.22 per claimant. If the claims rate is still ten percent, but twenty percent of claimants reached the inaccuracy threshold, the Reputational Injury Payment would pay a net of $156.53 per claimant and the Inaccuracy Injury Payment would pay a net of $783.00 per claimant.[7]

In addition to this monetary consideration, each Class Member will have the opportunity to receive both (1) a historical copy of the Class Member's consumer report, in addition to the

---

[7] There are six weeks remaining in the claim period, negotiated to provide a significant period of time for Class Members to submit claims.

identity of the end-user to whom the report was provided, and also (2) a copy of his or her current consumer report with the form and content of a report that BGC would provide in its US OneSEARCH to an employment-purpose end-user.

Finally, in addition to the other relief, BGC has agreed to implement several material changes to its policies and procedures regarding the provision of background checks. These practice changes were demanded by Class Counsel and made an essential component of any settlement.  The negotiation of these practice changes was spearheaded by Sharon Dietrich of CLS, a nationally recognized legal services organization, and endorsed by all Class Counsel as meaningful, substantive, and valuable relief not only to the Class, but to non-class members who are future consumers.  Specifically, BGC has agreed to implement the following changes:

1)      At the time of the Plaintiff's report, BGC's web site had a feature under which it did not send a notice under 15 U.S.C. § 1681k(a)(1) when the user viewed a criminal record from BGC's criminal history database and affirmed that either (1) the records found did not match the consumer (for example, when a photograph did not match) or (2) the records would not result in an adverse effect on the consumer's ability to obtain employment. BGC has removed this feature, so that BGC now attempts to send such notice regardless of the user's statement when 15 U.S.C. § 1681k(a) requires.

2)      At the time of the Plaintiff's report, BGC's web site allowed an employment-purposes end-user to select criminal records for which BGC had no date of birth to be included in the report if the record had at least some address information, a photograph, or both to be used for matching the record to the consumer. BGC has changed this process, so that BGC will remove records with no date of birth from this record-selection process.

3)      At the time of the Plaintiff's report, BGC's web site allowed an employment-purposes end-user to select criminal records for which BGC had a partial date of birth to be included in the report. BGC has changed this process, so that BGC will remove records with partial dates of birth from this record-selection process unless the client positively requests records with partial dates of birth and the record has at least some address information, a photograph, or both.

4)      BGC has enhanced its web site to include, in any employment-purposes report to an end-user that includes a criminal record from its criminal database for which only a partial date of birth is available, a statement to the effect that BGC matched the record based on a partial date of birth. Nothing in this Settlement Agreement prohibits BGC

from adding additional statements about matching criteria, including a statement to the effect that BGC is displaying the record based on additional matching identifiers, such as the end-user's confirmation that a photograph matches the subject of the report.

5)      BGC shall enhance its web site to more strictly prevent criminal records from appearing in employment-purposes end-user reports that do not include all of the following: offense, disposition (which may include that the criminal case is pending), and disposition date (unless the criminal case is pending). BGC will complete this feature no later than June 30, 2015.

6)      BGC shall enhance its web site to attempt to identify recent criminal records indicating that the subject of the record is currently incarcerated, and to exclude the identified criminal records for reports where the client indicates that work state will be a state other than the state of incarceration. BGC will complete this feature no later than June 30, 2015.

7)      BGC shall enhance its web site to allow a person procuring a report for resale to apply to the report the same matching and filtering logic that BGC applies to its own end-user reports. This paragraph applies only to a report if (1) BGC sells the report to someone who states that it will resell the report, (2) the report is a consumer report, and (3) the report is for employment purposes. BGC will complete this feature no later than June 30, 2015.

8)      BGC shall enhance its web site (1) to require that a reseller indicate whether the reseller will assure a report's compliance with 15 U.S.C. § 1681k(a) through compliance with 15 U.S.C. § 1681k(a)(1), through compliance with 15 U.S.C. § 1681k(a)(2), or through compliance with both, and (2) if compliance is through 15 U.S.C. § 1681k(a)(1) only, to apply to the report the same matching and filtering logic that BGC would apply to its own end-user reports. This paragraph applies only to a report if (1) BGC sells the report to someone who states that it will resell the report or use the report to prepare its own report, (2) the report is a consumer report, (3) the report is for employment purposes, and (4) the reseller states that either (i) that it is a consumer reporting agency for the report that it resells or that it prepares based on BGC's report or (ii) that it will resell BGC's report to someone who is a consumer reporting agency for the report that it resells or that it prepares based on BGC's report. BGC will complete this feature no later than July 31, 2015.

This non-monetary consideration is substantial and will prevent future harm to not only the Settlement Class Members, but to thousands of non-class members. If it had not been for the litigation prosecuted by Mr. Thomas and the attorneys in this case, BGC would not have made these process changes, including the material changes to its website.

3.      **The Notice Process is Complete**

In accordance with the Court's Preliminary Approval Order, Class Counsel retained a national class administration company, McGladrey, LLP, to accomplish printing, mailing, and processing the notices for the settlement.   (Doc. 84). The Administrator was chosen after a request for proposal and bid process.  *Id.*  McGladrey is experienced in administering large class settlements, especially complex class settlements.  *Id.* ¶ 6.   All actions taken by the Administrator to date have been under the direct supervision of Class Counsel.

Class Notice is a fairly well-established process.  An experienced administrator such as McGladrey is critical to the success of the mailed-notice program from the beginning when the class list is provided by the Defendant.  In this case, the Administrator assisted BGC in locating 98,240 class member addresses in order to establish the mailing list.  (Barkan Decl. ¶ 2-4). McGladrey used a commercially available database called Accurint in order to locate the Class Member addresses.  *Id.*  Shortly thereafter, BGC provided the Class List, which contained 408,526 individual names, but over 12,590 of those Class Members still had no address, with no provision for obtaining an address after the Accurint address search had been completed. (Barkan Decl. ¶ 5-6). Of the remaining 395,936 names that had addresses, the Administrator identified 2,872 names that appeared more than once, but had more than one address.  (Barkan Decl. ¶ 6). In order to maximize the possibility of delivering the notice to the class members, the Administrator mailed notices to Class Members at each address they were given.  Of the 395,936 notices mailed, a total of 78,698 were returned as undeliverable with no forwarding addresses. (Barkan Decl. ¶ 7). A total of 444 were returned with a forwarding address, which the Administrator then forwarded to the Class Members at their new address. (Barkan Decl. ¶ 8). The effective delivery rate was 78% given the total number of names, 408,526, and the number

of notices that were undeliverable, whether because there was no address to begin with or they were returned without a forwarding address, was 91,288.

In addition to the mailed notice, the Administrator established a website pursuant to the Settlement Agreement and Court's preliminary approval order, at *http://www.bgcthomassettlement.com*.   The website was launched on May 27, 2015 and provides access to the following information: (i) the full text of the Amended Settlement Agreement; (ii) the Long-Form Notice (in English and Spanish); (iii) the Claim Form (in English and Spanish), in PDF format; (iv) the Preliminary Approval Order; (v) the Short-Form Notice (in English and Spanish); (vi) the Limited Claim Reservation Form (in English and Spanish); (vii) the Exclusion Request Form; (viii) the Third Amended Class Complaint; (ix) frequently asked questions; and (x) contact information for Settlement Class Counsel and the Settlement Administrator. (Barkan Decl. ¶ 10-11).

The mailed notice process was certainly the best available given the factors of this case, including the large number of individuals in the class and the fact that the Administrator assisted BGC in developing the address list using a commercially available database, Accurint. While it is almost always difficult to obtain current addresses and identification information on class members, especially when a consumer may be facing difficulty finding employment, the Parties and Administrator were able to minimize this problem in this case.

    **4.**       **Settlement Results**[8]

---

[8]    Plaintiff has moved the Court for entry of an attorneys' fee and for costs within the customary range of common fund contingency fees.  The Court of course must first approve any fee award and Class Counsel does not disrespectfully presume anything in the calculations that follow.  However, Class Counsel's estimate of class recoveries will conservatively assume the fee award is granted as moved.

The Settlement is an excellent result for the Class because it provides a substantial cash benefit to every single member of the Class that submitted claim form, which claim is simple and could be submitted online or by mail. Because there are still six weeks left in the claim process, it is not possible to know the exact net payment to Class Members, but there will be money that has left the Defendant into the pockets of each claimant.  These payments are made to consumers who give up few of their rights, release only the narrowest of claims and who have not otherwise attempted any litigation of their own, though the period of limitations for claims  may have long ago expired. The Class also has the opportunity to obtain their past and current consumer reports, and an expedited dispute process, and most notably, significant process changes that are valuable to the Class and to all consumers.  *See, e.g. Poertner v. The Gillette Co.,* No. 14-13882, slip op. at 11-12 (11th Cir. July 16, 2015)(unpublished)(affirming the District Court's approval of a class action settlement with nonmonetary relief and holding that Defendant's cessation of the sale of the disputed batteries was not an illusory class benefit, but rather was a direct result of the class action litigation).

Despite best reasonable efforts designed and implemented by the Parties to locate each class member, the "class member not found" percentage is approximately 22%. Even though some class members were not able to be located, 78% of the Class Members received notice and this percentage is consistent with a successful notice program. *Alberton v. Commn'w Land Title Ins. Co.,* No. 06–3755, 2008 WL 1849774, at *3 (E.D. Pa. Apr. 25, 2008) (direct notice projected to reach 70% of class plus publication in newspapers and Internet was sufficient); *Grunewald v. Kasperbauer,* 235 F.R.D. 599, 609 (E.D. Pa. 2006) (direct mail to 55% of class and publication in three newspapers and Internet was sufficient).

5.       **Class Member Reaction**

Unquestionably, the settlement is an excellent result for the Class. Indeed, the fact that there were no objections and only six opt-outs in a Class of 408,526 is a factor that militates in favor of finding the notice program and settlement a success.   Whether the Court considers the hundreds of thousands of Class Members who neither objected nor opted out, the 21,572 who affirmatively telephoned the Administrator for information about the settlement, the collective voice of the Class is clearly positive.   (Barkan Decl. ¶ 15).  By any account, this settlement is a resounding success for the Class Members.

With such a large class, it has been Class Counsel's experience that there are almost always some number of "class action attorneys are greedy" or "BGC should be put out of business" objections – but none were made in this case. Presumably, even professional objectors or "greenmailers"[9] did not find a valid basis to challenge the settlement.

### III.   ARGUMENT

**A.    The Proposed Settlement is Fair, Reasonable, and Adequate and Should Be Approved.**

#### 1.    The Standard for Judicial Approval of Class Action Settlements

Settlement by compromise is part of a strong judicial policy within this Circuit favoring resolution of litigation prior to trial. *See e.g., S.C. Nat'l Bank v. Stone,* 749 F. Supp. 1419, 1423 (D.S.C. 1990) ("[t]he voluntary resolution of litigation through settlement is strongly favored by

---

[9]      "[P]rofessional objectors' almost invariably groundless objections delay the provision of relief to class members who, in most instances, have already waited years for resolution. Second, by feeding off the fees earned by class counsel who took the risk of suing defendants on a purely contingent basis, as is the normal practice in class actions, professional objectors create a disincentive for class counsel to take on such risky matters. That disincentive clashes with the public interest, repeatedly recognized by courts, to incentivize class counsel to handle such cases."

Bruce D. Greenberg, *Keeping the Flies Out of the Ointment: Restricting Objectors to Class Action Settlements*, 84 St. John's L. Rev. 949, 951 (2010).

the courts") (citing *Williams v. First Nat'l Bank,* 216 U.S. 582 (1910)). Settlement spares the litigants the uncertainty, delay and expense of a trial and appeals while simultaneously reducing the burden on judicial resources. As the court in *S.C. Nat'l Bank* observed:

> In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strains such litigation imposes upon already scarce judicial resources.

749 F. Supp. at 1423 (quoting *Armstrong v. Bd. of Sch. Dirs.,* 616 F.2d 305, 313 (7th Cir. 1980)).

In order to safeguard the interests of the absent class members, all class settlements and the corresponding later dismissal of the case, requires Court approval. Fed. R. Civ. P. 23(e)(1)(A). The process for that approval is governed by Rule 23(e), which provides, in relevant part:

> (e) Settlement, Voluntary Dismissal, or Compromise.
>
> (1)(A) The court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class.
>
> (B) The court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise.
>
> (C) The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate.
>
> (2) The parties seeking approval of a settlement, voluntary dismissal, or compromise under Rule 23(e)(1) must file a statement identifying and agreement made in connection with the proposed settlement, voluntary dismissal, or compromise.

Rule 23(e) thus imposes two basic requirements on the parties and on the Court before the approval of a class settlement and dismissal. First, the Court must determine that notice was directed "in a reasonable manner to all class members." Fed R. Civ. P. 23(e)(1)(B). Second, the Court must determine that the settlement "is fair, reasonable, and adequate." The parties address each of these requirements.

18

Federal jurisprudence strongly favors resolution of class actions through settlement. *San Francisco NAACP v. San Francisco Unified Sch. Dist.,* 59 F. Supp. 2d 1021, 1029 (N.D. Cal. 1999); *see* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy."). Rule 23 requires Court review of the resolution of a class action such as this one. Specifically, the Rule provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Court approval is required to ensure that the parties gave adequate consideration to the rights of absent class members during settlement negotiations. *Henley v. FMC Corp.,* 207 F. Supp. 2d 489, 492 (S.D. W. Va. 2002) (*citing In re Jiffy Lube Sec. Litig.,* 927 F.2d 155, 158 (4th Cir. 1991)).

Despite the policy favoring settlement, in a class action, a Court may approve a settlement only after a hearing and upon a finding that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Approval of a class action settlement is committed to the "sound discretion of the district courts to appraise the reasonableness of particular class-action settlements on a case-by-case basis, in light of the relevant circumstances." *In re MicroStrategy, Inc. Sec. Litig.,* 148 F. Supp. 2d 654, 663 (E.D. Va. 2001). However, "there is a strong initial presumption that the compromise is fair and reasonable." *Id. (quoting S. Carolina Nat'l Bank v. Stone*, 139 F.R.D. at 339).

In determining whether a given settlement is reasonable, the court should avoid transforming the hearing on the settlement into a trial on the merits regarding the strengths and weaknesses of each side of the case. *Flinn v. F.M.C. Corp*, 528 F.2d 1169, 1172-73 (4th Cir. 1975). Ultimately, the approval of a proposed settlement agreement is in the sound discretion of

19

the Court. *Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995)(citing *Jiffy Lube*, 927 F.2d at 158).

## 2.      The Notice to the Class Members was Reasonable

In a settlement class maintained under Rule 23(b)(3), the class notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e). Rule 23(e) specifies that "[n]o class action may be "dismissed or compromised without [court] approval,' preceded by notice to class members." Fed. R. Civ. P. 23(e). Rule 23(c)(2) requires that notice to the class must be "the best practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c). The Rule also requires that the notice inform potential class members that (1) they have an opportunity to opt out; (2) the judgment will bind all class members who do not opt out; (3) and any member who does not opt out may appear through counsel. *Id.* The Court must consider the mode of dissemination and the content of the notice to assess whether such notice was sufficient. *See* Federal Judicial Center, *Manual for Complex Litigation* § 21.312 (4th 2004).

The class list was compiled by BGC and with the assistance of the Administrator, reasonable measures were taken to locate updated addresses for the Class Members.  First, at the time the case was settled in principle, BGC estimated the class to be about 430,000 people. However, when BGC provided the Section 1681k Class list to the Administrator, the list contained 408,526 total names of individuals who were the subject of a background check that contained negative public record information.  (Barkan Decl. ¶ 3). The Administrator mailed notices to 395,936 class members, for whom it had an address, via first class U.S. Mail postage as required by the Settlement Agreement. After initial mailing was made, the Administrator received 79,142 notices back as undeliverable. After undertaking a process to identify and update

those addresses, the Administrator was able to identify new addresses and re-mail 444 notices to these class members. *Id.* Ultimately, the Administrator was unable to locate 91,288 Class Members. *Id.*

The efforts that the Administrator used to identify class member addresses was thorough given the size of the class and the terms of the Settlement Agreement governing the methods by which the Administrator was to locate addresses. With a 78% delivery rate, it is difficult to say that there was truly no better alternative that could have been attempted. However, the process by which the class list was developed and the mailing implemented is a tried-and-true method, and very likely the best method, for identifying class members, obtaining their addresses, and mailing them the class notice.

As this Court has held, "[w]hat amounts to reasonable efforts under the circumstances is for the Court to determine after examining the available information and possible identification methods . . . 'In every case, reasonableness is a function of [the] anticipated results, costs, and amount involved.'" *Fisher v. Va. Elec. & Power Co.,* 217 F.R.D. 201, 227 (E.D. Va. 2003) (citations omitted). The Supreme Court has concluded that direct notice satisfies due process, *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812-13 (1985), and other courts – including this court and others within the Fourth Circuit – have approved mailed-notice programs that reached a much smaller percentage of class members than the class notice reached in this case. *See In re Serzone,* 231 F.R.D. 221, 236 (S.D. W. Va. 2005) (approving notice program where direct mail portion was estimated to have reached 80% of class members); *Martin v. United Auto Credit Corp.,* 3:05cv00143 (E.D. Va. Aug. 29, 2006) (Final Order approving class notice with approximately 85% delivery); *Alberton,* 2008 WL 1849774, at *3 (approving direct notice

projected to reach 70% of class with internet and publication notice); *Grunewald,* 235 F.R.D. at 609 (approving 55% mailed delivery rate, with internet and publication notice).

BGC also served notice of this settlement on the relevant state and federal authorities as required by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1715. No appearance has been entered by any state attorney general or the attorney general of the United States pursuant to CAFA, and none of these agencies or states objected to the Settlement. The Parties' efforts to provide class members with notice of the settlement makes in clear that such notice was the best available notice under the circumstances given: (a) the available information; (b) the possible identification methods; (c) the number of class members; and (d) the amount of the settlement. The Parties have complied fully with the Court's Preliminary Approval Order, and have taken reasonable steps to ensure that the Class Members were notified – in the best and most direct manner possible – of the Settlement's terms and excellent benefits.

### 3.    An Analysis of the *Jiffy Lube* Factors Demonstrates that the Settlement is Fair and Reasonable

The next phase of the Court's determination of compliance with Rule 23(e)(1)(c) typically requires a two-part analysis, often referred to as the *Jiffy Lube* factors. The Court must determine whether the settlement is "fair and reasonable" and then whether the settlement is "adequate." The approval of a proposed settlement agreement is in the sound discretion of the Court. *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 158.

The first step in the *Jiffy Lube* analysis is a determination as to the fairness of the settlement. The fairness factors are critical to the protection of the class members from unscrupulous class counsel and relate to whether there has been arm's length bargaining. *See In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1383 (D. Md. 1983); *S. Carolina Nat'l Bank v. Stone*, 139 F.R.D. 335, 339 (D.S.C. 1991). The court must consider four factors: (i)

the posture of the case at the time of settlement; (ii) the extent of discovery that has been conducted; (iii) the circumstances surrounding the negotiations; and (iv) the experience of counsel. *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 158-59; *see also In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 663-64; *Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995). A proposed class action settlement is considered presumptively fair where there is no evidence of collusion and the parties, through capable counsel, have engaged in arm's length negotiations. *See S. Carolina Nat'l Bank*, 139 F.R.D. at 339. As described below, the settlement reached in this case is clearly fair and each of the *Jiffy Lube* factors are satisfied.

The Parties agreed to settle only after conducting extensive merits-related discovery, both formally and informally. The Parties exchanged and answered written discovery, issued many third party subpoenas, and took fact-witness depositions, and obtained the original court files for each of the Plaintiffs. During and after the discovery period, the Parties conducted extensive and substantive settlement talks, both on the phone and in person with two different neutrals: Rodney Max, a private mediator, and Judge Novak, a sitting Untied States Magistrate Judge in the U.S. District Court in Richmond, Virginia.  There were numerous contacts among counsel leading up to and following the mediation sessions, including preparation of detailed mediation statements. It was not possible to settle the case at an earlier posture –discovery and litigation was necessary to bring the Parties to a posture where they were each willing to compromise and where they each had a grasp of the facts and law of the case. The Plaintiffs conducted reasonable discovery that included review of thousands of pages of documents; retention and consultation with an expert. Litigation was so forcefully pursued, the Parties agreed it was necessary to seek a stay of litigation in order to have meaningful settlement discussions.

The posture of the case at the time of settlement is a factor that supports approval. *See In*

*re Microstrategy, Inc.*, 148 F. Supp. 2d at 664 (approving of proposed settlement despite the fact that it was reached "early" in litigation). The allegation in this case was that BGC failed to provide the proper FCRA disclosures after supplying an employment-purposed background check to prospective employers. Although BGC does not acknowledge any wrongdoing and denies that it had any obligation under § 1681k(a)(1), had the case not settled when it did, the Plaintiffs were sufficiently prepared to move for class certification, which the Defendant was prepared to contest.

Class Counsel in this case are all highly-skilled and experienced consumer protection attorneys who have successfully litigated individual and class cases on behalf of consumers, including the FCRA. There are advantages not only to the parties, but also to the court when opposing counsel are already experts on the legal and factual issues in a case and in a field of practice. *See S. Carolina Nat'l Bank*, 139 F.R.D. at 339 (concluding fairness met where settlement discussions "were, at times, supervised by a magistrate judge and were hard fought and always adversarial," and those negotiations "were conducted by able counsel" with substantial experience in the area of securities law). Experienced counsel negotiated the Settlement, making it their first priority bringing the best benefit possible to their clients, and in Plaintiffs' cases, to the Class. (Decl. of Leonard A. Bennett)(Ex. 2).

Leonard Bennett, Matthew Erausquin, Casey Nash and Susan Rotkis of Consumer Litigation Associates, P.C., have extensive collective experience in both consumer protection and class action litigation, having been involved in numerous, consumer class actions – both large and small -- where they have been found to be suitable Class Counsel. *See e.g. Soutter v. Equifax Info. Servs., LLC,* 3:10CV107, 2011 WL 1226025 (E.D. Va. Mar. 30, 2011) ("[T]he Court finds that Soutter's counsel is qualified, experienced, and able to conduct this litigation.

Counsel is experienced in class action work, as well as consumer protection issues, and has been approved by this Court and others as class counsel in numerous cases."); *See also Williams v. Lexis-Nexis Risk Mgt.*, No. 3:06CV241 (E.D.Va. 2008); *Beverly v. Wal-Mart*, No. 3:07Cv469 (E.D.Va. 2007); *Capetta v. GC Servs., Inc.,* No. 3:02cv288 (E. Va.); *Ryals v. HireRight Sols. Inc.,* No. 3:09CV625 (E.D.Va.), *Daily v. NCO,* No. 3:09CV031 (E.D.Va. 2011); *Conley v. First Tennessee,* No. 1:10CV1247-TSE (E.D.Va.)*; Lengrand v. Wellpoint,* No. 3:11CV333-HEH (E.D.Va.); *Henderson v. Verifications Inc.,* No. 3:11CV514-REP (E.D.Va. 2013); *Pitt v. K-Mart Corp.*, No. 3:11CV697 (E.D. Va. May 24, 2013); *James v. Experian Info. Sols.*, No. 3:12CV902 (E.D.Va. Oct. 29, 2014) (approving in open court class counsel's hourly rates as reasonable and finding "that class counsel are experience and qualified."); *Thomas v. Wittstadt*, Civ. No. 3:12CV450 (E.D. Va. 2013); *Shami v. Middle East Broadcast Network*, No. 1:13CV467-CMH (E.D.Va. April 30, 2014); *Roe v. Intellicorp, Inc.,* No. 1:12CV2288-JG (N.D.Oh. June 5, 2014); *Reardon v. ClosetMaid, Inc*., No. 2:08CV1730 (W.D.Pa. June 13, 2014); *Goodrow v. Freidman Freidman & MacFadyen*, No. 3:11CV20 (E.D.Va. June 4, 2014); *Berry v LexisNexis Risk & Info. Analytic Sols., Inc., No.* 3:11CV274 (E.D.Va. Sept. 5, 2104); *Edwards v. Horizon Staffing, Inc.,* No. 1:13cv3002 (N.D.Ga. Jan. 2, 2015); *Marcum v. Dolgencorp,* 3:12CV108 (E.D.Va.); *Kelly v. Nationstar,* 3:13CV311 (E.D.Va.); *Wyatt v. SunTrust Bank*, 3:13CV662 (E.D. Va.). In a recent district court decision on a motion to disqualify settling counsel – which included CLA -- in an FCRA class action, the court opined that while both counsel were skilled and experienced, settling counsel (including CLA) unquestionably had more class action, consumer class action and FCRA experience. *White v. Experian Info. Sols. Inc.*, Civ. No. 8:05CV1070 (C.D. Ca.  Jan. 21, 2014)(Doc. 952.) (Bennett Decl.).

Francis & Mailman concentrates its practice in consumer protection litigation, with two of the firm's primary practice concentrations being FCRA litigation and consumer class actions, such as the instant matter. (Decl. of James A. Francis)(Ex. 3).  The firm of Francis & Mailman, P.C. has been found to be well-qualified to represent FCRA consumer classes by courts in many districts, has been certified as class counsel on over thirty (30) occasions, and its work product has been commended by various federal courts.[10]  *Id.*  Because of its experience, the firm has been appointed class counsel over objection and competing counsel's challenge in interim appointment litigation.[11]

Sharon Dietrich has been practicing law since 1985.  (Dietrich Decl.)(Ex. 4). For 28 of the last 30 years, she has served as an attorney at Community Legal Services in Philadelphia, PA, where she currently serves as its litigation director.  In addition to her work at CLS, she also provides assistance as part of the National Employment Law Project ("NELP"). Through her contact with NELP clients, Ms. Dietrich has been a creative and driving force behind identifying and bringing forward FCRA claims against consumer reporting agencies that provide employment-purposed consumer reports without complying with the FCRA.  She has represented consumers in hundreds of cases, most notably in the FCRA employment purpose

---

[10]     *See, e.g., Patel v. Trans Union, LLC,* C.A. 3:14-CV-00522-LB, 2015 WL 3945411 (N.D. Cal. June 26, 2015)(find that firm has "extensive experience" and has represented consumer classes in many cases in many districts");  *Barel v. Bank of America*, 255 F.R.D. 393, 398-99 (E.D. Pa. 2009) (finding Francis & Mailman, P.C. "to be competent, experienced and well-qualified to prosecute class actions" and noting that class counsel "have done an excellent job in representing the class in the instant litigation.")

[11]     *See, e.g. White v. Experian Info. Solutions*, No. 05-01070, 2014 WL 1716154, at *13, 19, 22 (C.D. Cal. May 1, 2014) (finding Francis & Mailman "FCRA specialists" and appointing firm and its team as interim class counsel over objections from competing group because their team's "credentials and experience [we]re significantly stronger in class action and FCRA litigation.");  *Berry v. LexisNexis Risk & Information Analytics Group, Inc.*, No. 3:11-cv-754, 2014 WL 4403524, *11 (E.D. Va. Sept. 5, 2014) (finding Francis & Mailman, P.C. and its team adequate class counsel in contested objection).

context, *Giddiens v. LexisNexis Risk Solutions,* No. 12-cv-02624-LDD (E.D. Pa.)(Legrome Davis, J.); *Goode v. LexisNexis Risk & Information Analytics Group*, No. 11-2950 (E.D. Pa.)(Jan DuBois, J.); *Smith v. HireRight Solutions, Inc., et al.*, C.A. No. 09-CV-06007-RB (E.D. Pa. filed Dec. 2009) and *Henderson v. HireRight Solutions, Inc., et al.*, C.A. No. 10-CV-00459-RB (E.D. Pa. filed Feb. 1, 2010; consolidated with *Ryals v. HireRight Solutions, Inc., et al.*, Case No. 309-cv-625 (E.D. Va. Filed Oct. 5, 2009). Ms. Dietrich was instrumental in insisting and developing the process changes required to correct the FCRA injustices her clients had experienced and created the employment problems that were their most pressing concerns.

Christopher Colt North and William Downing of the Consumer & Employee Rights Law Firm are decades-long experienced employment and class action attorneys who, together with Consumer Litigation Associates, have been found to be adequate class counsel in this court and others.   Together they have also represented consumers in some of the largest class action settlements in Virginia.  *See, e.g. Williams v. Lexis-Nexis Risk Mgt.*, No. 3:06CV241 (E.D.Va. 2008); *Beverly v. Wal-Mart*, No. 3:07Cv469 (E.D.Va. 2007); *Ryals v. HireRight Sols. Inc.,* No. 3:09CV625 (E.D. Va.), *Pitt v. K-Mart Corp.*, No. 3:11CV697 (E.D. Va. May 24, 2013) and *Daily v. NCO,* No. 3:09CV031 (E.D. Va. 2011); *Marcum v. Dolgencorp,* 3:12CV108 (E.D. Va.). Mr. North was first retained by the Class Representative, Mr. Thomas, when he learned that his consumer report had been mixed with a person with a felony history, but he had not received the § 1681k notice from BGC.  Thus began a long process for Mr. Thomas with respect to finding employment and prosecuting his FCRA cases. It was Mr. North who first identified the FCRA violations that Mr. Thomas suffered.  (Ex. 5).

Dale Pittman is qualified, experienced and able to conduct this litigation, as this Court and others have frequently stated. *Souter v. Equifax Info. Servs., LLC,* 3:10CV107, 2011 WL

1226025 (E.D. Va. Mar. 30, 2011); *See Karnette v. Wolpoff & Abramson, L.L.P.*, 2007 U.S. Dist. LEXIS 20794 (E.D. Va. March 23, 2007); *Bicking v. Law Offices of Rubenstein and Cogan*, 2011 U.S. Dist. LEXIS 127173, * 9, n. 9 (E.D. Va., Nov. 3, 2011)(citing *Talbott v. GC Svcs., Ltd P'ship.*, 191 F.R.D. 99, 105 (W.D. Va. 2000)); *Jones v. Vest, No. 3:00cv287, 2000 U.S. Dist. LEXIS 19026, at *12 (E.D. Va. Dec. 27, 2000); Jones v. Vest*, 2000 U.S.Dist.LEXIS 19026, *12 (E.D.Va. 2000); *Kashani v. Integrity Collections*, et *a*l, No. 5:06-cv-73 (W.D. Va.); *Gansauer v. Transworld Sys., Inc.*, No. 7:CV931 (W.D. Va..); *Woodward v. Online Info. Servs.*, 191 F.R.D. 502, 506 (E.D.N.C. 2000).  (Pittman Decl.)(Ex. 6).

Keith Keogh and the attorneys of his firm represent classes in the two largest pending Telephone Consumer Protection Act ("TCPA") settlements in the country.  *See Hageman v. AT&T Mobility LLC, et al.*, Case 1:13-cv-00050-DLC-RWA (D. MT.) (Co-Lead) (Final Approval Granted February 11, 2015 providing for a $45 million settlement for a class of 16,000 persons) and *Capital One Telephone Consumer Protection Act Litigation*, et al., 12-cv-10064 (N.D. Ill. Judge Holderman) (Liaison Counsel and additional Class Counsel)(Final Approval Granted February 12, 2015 for a $75 million settlement)(pending appeal).  He was lead counsel in *Lopera v RMS*, 12-c-9649 (N.D. Ill. Judge Wood),  *Kubacki v Peapod*, 13-cv-729 (N.D. Ill. Judge Mason); *Wojcik v. Buffalo Bills, Inc.*, 8:12 CV 2414-SDM-TBM (M.D. Fl. Judge Merryday) (TCPA); *Curnal v LVNV Funding, LLC.*, 10 CV 1667 (Wyandotte County, KS 2014) (Unlicensed debt collector under KS law); *Cummings v Sallie Mae*, 12 C-9984 (N.D. Ill. Judge Gottschall)  (co-lead); *Brian J. Wanca, J.D., P.C. v. L.A. Fitness International, LLC*, Case No. 11-CV-4131 (Lake County, Il. Judge Berrones); *Osada v. Experian Info. Solutions, Inc.*, 2012 U.S. Dist. LEXIS 42330 (N.D. Ill. Mar. 28, 2012) (FCRA class); *Saf-T-Gard International, Inc. v.  Vanguard Energy Services, L.L.C.,  et al*, 12-cv-3671 (N.D. Ill. 2013 Judge Gottschall);

*Saf-T-Gard v TSI*, 10-c-7671, (N.D. Ill. Judge Rowland); *Cain v Consumer Portfolio Services, Inc.* 10-cv-02697 (N.D. Ill. Judge Keys); *Iverson v Rick Levin & Associates*, 08 CH 42955 Circuit Court Cook County (Judge Cohen); *Saf-T-Gard v Seiko,* 09 C 776 (N.D. Ill. Judge Bucklo); *Jones v. Furniture Bargains*, LLC, 09 C 1070 (N.D. Ill) (FLSA collective action); *Saf-T-Gard v Metrolift*, 07 CH 1266 Circuit Court Cook County (Judge Rochford) (Co-Lead); *Bilek* v *Countrywide,* 08 C 498 (N.D. Ill. Judge Gottschell); *Pacer* v *Rochenback,* 07 C 5173 (N.D. Ill. Judge Cole); *Overlord Enterprises* v. *Wheaton Winfield Dental Associates,* 04 CH 01613, Circuit Court Cook County (Judge McGann) (TCPA); *Whiting* v *SunGard,* 03 CH 21135, Circuit Court Cook County (Judge McGann) (TCPA); *Whiting* v. *Golndustry,03* CH 21136, Circuit Court Cook County (Judge McGann) (TCPA).  He was primarily responsible for class settlements in *Wollert* v. *Client Services,* 2000 U.S. Dist. LEXIS 6485 (N.D. Ill. 2000); *Rentas* v. *Vacation Break USA,* 98 CH 2782, Circuit Court of Cook County (Judge Billik); *McDonald* v. *Washington Mutual Bank,* supra; *Wright* v. *Bank One Credit Corp.,* 99 C 7124 (N.D. Ill. Judge Guzman); *Arriaga* v. *Columbia Mortgage,* 01 C 2509 (N.D. Ill. Judge Lindberg); *Frazier* v. *Provident Mortgage,* 00 C 5464 (N.D. Ill. Judge Coar); *Largosa* v. *Universal Lenders,* 99 C 5049 (N.D. Ill. Judge Leinenweber); *Arriaga* v. *GNMortgage,* (N.D. Ill. Judge Holderman); *Williams* v. *Mercantile Mortgage,* 00 C 6441 (N.D. Ill. Judge Pallmeyer); *Reid* v. *First American Title,* 00 C 4000 (N.D. Ill. Magistrate Judge Ashman); *Fabricant* v. *Old Kent, 99* C 6846 (N.D. Ill. Magistrate Judge Bobrick); *Mendelovits* v. *Sears,* 99 C 4730 (N.D. Ill. Magistrate Judge Brown); *Leon* v. *Washington Mutual,* 01 C 1645 (N.D. Ill. Judge Alesia)

Mr. Keogh has been appointed class counsel in *In Re Convergent Outsourcing, Inc. Telephone Consumer Protection Act Litigation*, Master Docket No. 3:13-cv-1866-AWT (D. Conn) (Interim Co-Lead);  *Galvan v. NCO Fin. Sys.*, 2012 U.S. Dist. LEXIS 128592 (N.D. Ill.

2012); *Osada v. Experian Info. Solutions, Inc.*, 2012 U.S. Dist. LEXIS 42330 (N.D. Ill. Mar. 28, 2012) (FCRA class)*; Pesce v First Credit Services*, 11-cv-01379 (N.D. Ill. December 19 2011) (TCPA Class); *Smith v Greytsone Alliance*, 09 CV 5585 (N.D. Ill. 2010); *Cicilline* v. *Jewel Food Stores, Inc.,* 542 F.Supp.2d 831 (N.D. Ill. 2008)(Co-Lead Counsel for FACTA class); *Harris* v. *Best Buy Co.,* 07 C 2559,2008 U.S. Dist. LEXIS 22166 (N.D.Ill. March 20, 2008)( FACTA class); *Matthews* v. *United Retail, Inc.,* 248 F.R.D. 210 (N.D.Ill. 2008)( FACTA class); *Redmon* v. *Uncle Julio's, Inc.,* 249 F.R.D. 290 (N.D. Ill. 2008)( FACTA class); *Harris* v. *Circuit City Stores, Inc.,* 2008 U.S. Dist. LEXIS 12596,2008 WL 400862 (N.D. Ill. 2008)( FACTA class); *Pacer* v *Rockenbach Chevrolet Sales, Inc.,* 07 C 5173 (N.D. Ill. 2008)( FACTA class). (Keogh Decl.)(Ex. 7).

Matthew Dooley, Anthony Pecora and Dennis O'Toole, are founders of the 14-attorney firm O'Toole McLaughlin Dooley & Pecora, Co., LPA, which has litigated and settled numerous class action cases prosecuted under the Fair Credit Reporting Act, including: *White v. CRST, Inc.*, Case No. 1:11-cv-2615 (N.D. Ohio); *Hall v. Vitran Express, Inc.*, Case No. 1:09-cv-00800 (N.D. Ohio); *Ryals v. HireRight Solutions, Inc.*, *et al,* Case No. 3:09-CV-625 (E.D. Va.); *Smith v. New England Motor Freight, Inc.,* Case No. 2:12-CV-03559 (N.J.D); *Roe, et al. v. Intellicorp Records, Inc., et al.,* Case No. 1:12-CV-02288 (N.D. Ohio); *Avery v. Boyd Bros. Transportation*, Case No. 4:13-CV-00579 (W.D. Missouri) (final approval pending); *Ellis, et al. v. Swift Transportation Co. of Arizona, LLC*, Case No. 3:13-CV-00473 (E.D. Va.).  We have additionally settled individual FCRA related cases, including *Smith v. Sterling*, Case No. 1:12-CV-0534 (N.D. Ohio); *Logsdon v. Sterling,* Case No. 1:13-CV-1123 (N.D. Ohio); *Johnson v. A-Check America, Inc.*, 2:12CV-09038 (C.D. California); *Wick v. Swift*, 3:13-CV-415 (W.D. Wisconsin); and *Johnson v. Hireright Solutions, Inc.*, Case No. 1:13-CV-03589 (N.D. Ga.); *Corliss v.*

*Providence*, Case No. 3-14-CV-00119 (Oregon);  *Avery v. Werner,* Case No. 4:14-CV00330 (W.D. Missouri); *Cox v. ScreeningOne, Inc.,* Case No. 4:14-CV-00229 (E.D. Ohio); *Cox v. Teletech Holdings, Inc.*, Case No. 1:14-CV00993 (N.D. Ohio), and are in the process of representing plaintiffs in several other class actions currently pending.  (Dooley Decl. )(Ex. 8).

Counsel's collective experience and expertise, together with discovery sufficient to aid Counsel and the Court in evaluating Plaintiffs' claims and Defendants' defenses, further point to the conclusion that the Settlement was the product of arm's-length negotiation by experienced counsel and thus warrants final approval. *See In re Jiffy Lube*, 927 F.2d at 159; *see also Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501-02 (E.D. Va. 1995) (concluding fairness requirement met where "plaintiffs' counsel, with their wealth of experience and knowledge in the securities-class action area, engaged in sufficiently extended and detailed settlement negotiations to secure a favorable settlement for the Class").

The Parties fairly reached the settlement through adversarial litigation and arm's-length negotiation process as in the present instance, with the assistance of a private mediator and a United States Magistrate Judge, which more than satisfies the requirement that the settlement not be one brokered through "collusion or coercion." *See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005); *Weiss v. Regal Collections*, Civ. No. 01CV881-DMC, 2006 WL 2038493, at *2 (D.N.J. July 19, 2006).

**4.     An Analysis of the *Jiffy Lube* Factors Demonstrates that the Settlement is Adequate**

The Court must also determine whether the proposed class settlement is substantively "adequate," the second prong of the *Jiffy Lube* analysis. The Fourth Circuit's decision in *Jiffy Lube* teaches that the adequacy inquiry is guided by evaluating: (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the

plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement. *In re Jiffy Lube,* 927 F.2d at 159. Plaintiff has at all times believed that this case was very strong in several regards, including being able to establish basic FCRA liability and that the named Plaintiffs were typical not only of the Class but also of consumers seeking employment requiring a consumer report. However, the Defendant was prepared at all times to contest class certification and the whether it was even required to send a section 1681k(a)(1) notice as it argued in its motion for summary judgment. Under the FCRA, liability can be established either upon a showing of negligent or willful noncompliance.  15 U.S.C. §§ 1681n, 1681o.  If negligent noncompliance is proven, a consumer may recover actual damages.  In the case of willful noncompliance, a consumer may recover statutory and punitive damages.  As a practical matter, the Plaintiffs would have to proceed as a class either under a theory of negligence and thus prove uniform actual damages, or proceed under a willfulness theory requiring the higher standard of proof in order to recover statutory and punitive damages. Either way, the Plaintiffs would be required to produce adequate evidence for a jury to find BGC willfully violated the FCRA by failing to send the notice to consumers about whom it had issued an employment-purposed consumer report containing a criminal public record likely to adversely affect employment at the time is issued the reports to end users.  Without the certainty afforded both sides in the approval of the class settlement, all parties would have proceeded with a long, expensive litigation process likely to culminate in a trial on the merits likely followed by appeal.

Despite the fact that Plaintiff's counsel and Defendant's counsel were at all times professional, each side zealously represented the interests of their clients in vigorously contested

litigation. Even in the face of denial of coverage by its carrier, BGC retained Kilpatrick Stockton LLP, a prestigious international law firm with more than 800 lawyers in 14 locations. Kilpatrick Stockton assigned one of its most experienced partners in class action and consumer financial services litigation to this case, which factor alone could have affected the outcome of the case at any stage.   BGC also retained two of the partners of Leclair Ryan PC, who are also very experienced consumer finance and class action attorneys and therefore brought more to the representation than merely acting local counsel.   At the same time this case was being litigated, BGC was in litigation with its insurance company, which could have significantly altered the outcome of the case at any juncture.

The determination of when it is appropriate to settle a case is one that is entrusted to experienced class counsel. It can be difficult to transition off of a litigation track focused on an upcoming trial and meeting the various burdens of proof to a mindset that considers that every case – no matter how conceivably strong it may seem – will always have an element of risk. Settlement is the only outcome that allows both sides to be assured of a certain ending to the litigation, alleviating both the risk and cost inherent in further litigation to both sides, as well as the additional burden on the Court. This case was no exception, and in fair consideration of the strengths and weaknesses (as well as with significant involvement by Mr. Max and Judge Novak), Plaintiffs' counsel felt that settlement was appropriate at this juncture because of the excellent result for both of the classes based on the allegations in the Complaint. *See Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.,* No. 85CV4038, 1987 WL 7030, at *2 (S.D.N.Y. Feb. 13, 1987) (concluding that because continued prosecution of the action would have been expensive and time-consuming, and would have involved substantial risks, "it [was] not unreasonable for the plaintiff class to take a 'bird in the hand'"); *Alvarado Partners, L.P. v. Mehta*, 723 F. Supp.

540, 547 (D. Colo. 1989) (noting that "[i]t has been held prudent to take 'a bird in the hand instead of a prospective flock in the bush'" in weighing the value of an immediate recovery against "the mere possibility of future relief after protracted and expensive litigation") (quoting *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 740 (D.W.V. 1970)); *In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 667.

Given the risks to both sides, and the possibility that the Plaintiffs may not prevail at trial, the *Jiffy Lube* factors militate in favor of the adequacy of the settlement.  Each member of the Class who filed a claim will receive a payment, which will be calculated based on the type of claim.  If the court approves attorneys' fees and costs of 30%, to which the parties agreed and Class Counsel is requesting, the fees and costs will be deducted from the Fund. By its terms, the settlement provides substantial monetary consideration to all class members who submit a simple claim, as well as a copy of past and current consumer report, and expedited dispute mechanism and meaningful process changes. These benefits realized by the class members immediately are significant, particularly given the time value of money. A dollar realized today is worth considerably more than the same dollar finally collected years later, even assuming the success on the merits and on appeal, and the ability to collect any judgment that was rendered. This factor weighs in favor of the adequacy of the settlement.

It is convincing that despite mailing 395,936 total notices, no class members have objected and only six have opted out. "Such a lack of opposition to the partial settlement strongly supports a finding of adequacy, for '[t]he attitude of the members of the Class, as expressed directly or by failure to object, after notice to the settlement is a proper consideration for the trial court.' *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)." *In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 668. As the Court has previously explained, "[b]ecause 'the reaction of

the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.' The lack here of any objections to the partial settlement and the small number of class members choosing to opt-out of the case strongly compel a finding of adequacy" *Id.* (citing *Sala v. Nat'l R.R. Passenger Corp.*, 721 F. Supp. 80, 83 (E.D. Pa. 1989). "The small number of objections necessarily must be evaluated relative to the size of this Class of over 1.0 million members. In litigation involving a large class it would be "extremely unusual" not to encounter objections. *See In re Anthracite Coal Antitrust Litig.,* 79 F.R.D. 707, 712–13 (M.D.Pa.1978), *aff'd in part,* 612 F.2d 571 and 612 F.2d 576 (3d Cir.1979)." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 478-79 (S.D.N.Y. 1998). Where "[t]he parties objecting to the settlements are both qualitatively and quantitatively insignificant," their objections may be disregarded. *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1327 (5th Cir. 1981), *cert. denied sub nom. CFS Continental, Inc. v. Adams Extract Co.*, 456 U.S. 998 (1982). Courts recognize that where the class as a whole supports a settlement, it should be approved.[12] Indeed, even a small majority of support creates a presumption in favor of approval. *See Reed v. Gen'l Motors Corp.*, 703 F.2d 170, 174 (5th Cir. 1983) (approving class action settlement where more than 40 percent of class objected or opted out); *Cotton v. Hinton*, 559 F.2d 1326, 1333 (5th Cir. 1977) (nearly 50 percent opted out or objected; settlement nevertheless approved).

Considering all these factors, the Settlement is adequate under the *Jiffy Lube* standard.

---

[12]   *See, e.g., In re Beef Industry Antitrust Litig.*, 607 F.2d 167, 180 (5th Cir. 1979), *cert. denied sub nom. Iowa Beef Processors, Inc. v. Meat Price Investigators Ass'n*, 452 U.S. 905 (1981); *Laskey v. Int'l Union*, 638 F.2d 954 (6th Cir. 1981) (small number of objectors demonstrates fairness of a settlement); *Shlensky v. Dorsey*, 574 F.2d 131 (3rd Cir. 1978) (same); *Bryan v. Pittsburgh Plate Glass Co. (PPG Indus., Inc.)*, 494 F.2d 799, 803 (3d Cir.) (20 percent opted out or objected; settlement approved), *cert. denied sub nom. Abate v. Pittsburgh Plate Glass Co.*, 419 U.S. 900, (1974); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20 (2d Cir. 1987) (thirty-six percent; settlement approved); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (sixteen percent; settlement approved).

**B.**      **The Court Should Approve the Request for an Award of Service Payment to Mr. Thomas, Attorneys Fees and Reimbursement of Expenses**

**1.**      **The Court Should Award Service Payment to the Class Representative**

The Court should also approve service award for the named Plaintiff. Plaintiff requests a service award of $5,000.00 for his service as class representative. The service award is to be deducted from the Settlement Fund.  In this case, the Plaintiff took an active role in the case, participated in answering discovery and testifying in a deposition. He understood his role as class representative and was answerable to counsel in prosecuting the case. Such awards are reasonable and have been regularly approved by judges in the Eastern District of Virginia. *See e.g. Beverly v. Wal-Mart Stores, Inc.*, No. 3:07cv469; *Williams v. Lexis Nexis Risk Mgmt.*, No. 3:06cv241; *Cappetta v. GC Servs. LP*, No. 3:08cv288-JRS (E.D. Va. April 27, 2011); *Makson v. Portfolio Recovery Assoc., Inc.*, No. 3:07cv982-HEH (E.D. Va. Feb. 9, 2009); *Daily v. NCO,* No. 3:09CV31-JAG*; Conley v. First Tennessee,* No. 1:10CV1247-TSE*; Lengrand v. Wellpoint,* No. 3:11Cv333-HEH*; Henderson v. Verifications Inc.,* No. 3:11CV514-REP (E.D.Va. 2013)*; Pitt v. K-Mart Corp.*, No. 3:11CV697 (E.D. Va. May 24, 2013); *James v. Experian Info. Sols.*, No. 3:12CV902 (E.D.Va. Oct. 29, 2014); *Thomas v. Wittstadt*, Civ. No. 3:12CV450 (E.D. Va. 2013); *Shami v. Middle East Broadcast Network*, No. 1:13CV467-CMH (E.D.Va. April 30, 2014); *Goodrow v. Freidman Freidman & MacFadyen*, No. 3:11CV20 (E.D.Va. June 4, 2014); *Berry v LexisNexis Risk & Info. Analytic Sols., Inc., No.* 3:11CV274 (E.D.Va. Sept. 5, 2104); *Marcum v. Dolgencorp,* 3:12CV108 (E.D.Va.); *Kelly v. Nationstar,* 3:13CV311 (E.D.Va.); *Wyatt v. SunTrust Bank*, 3:13CV662 (E.D. Va.). Particularly in light of historical incentive awards both within and outside this District, the incentive awards sought are appropriate. *See e.g. Staton v. Boeing Co.*, 327 F.3d 938, 976-77 (9th Cir. 2003); *In re Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002); *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).  "An empirical study published

36

in 2006 suggests that incentive awards are granted in only about a quarter of class suits (28%) and that the average award per class representative is about $16,000, with the median award per class representative being closer to $4,000." 4 Newberg on Class Actions § 11:38 (4th ed.).

2.     **The Requested Attorneys' Fee of 30 Percent of the Common Fund is Squarely Within the Range of Approval.**

The Supreme Court has consistently calculated attorneys' fees in common funds cases on a percentage-of-the-fund basis. *See Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165-67 (1939); *Boeing Co. v. van Gemert*, 444 U.S. 472, 478-79 (1980); *Blum v. Stenson*, 465 U.S. 886, 900 n. 16 (1984); *see also* Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 242 (Oct. 8, 1985) (noting that fee awards in common funds cases have historically been computed based on a percentage of the fund). The Supreme Court has never adopted the lodestar method over the percentage of recovery method in a common fund case, even when lower federal courts began using the lodestar approach in the 1970's. *See Shaw v. Toshiba Am. Info. Sys., Inc.* 91 F. Supp. 2d 942, 943 (E.D. Tex. 2000); *see also Manual for Complex Litigation* § 24.121 at 210.,

Since *Blum*, virtually every Circuit Court of Appeals has joined the Supreme Court in affirmatively endorsing the percentage of recovery method as an appropriate method for determining an amount of attorneys' fees in common fund cases. *See In re GMC*, 55 F.3d 768, 821-22 (3rd Cir. 1995); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-50 (9th Cir. 2002); *In re Thirteen Appeals Arising out of the San Juan DuPont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995); *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994); *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 515-16 (6th Cir. 1993); *Camden I. Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991); *Swedish Hosp. Corp v. Shalala*, 1 F.3d 1261, 1268-70 (D.C. Cir. 1993); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 49 (2nd Cir. 2000).

In the Fourth Circuit, attorneys' fees in common fund cases such as this one are almost universally awarded on a percentage-of-the-recovery basis. *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05cv00187, 2007 WL 119157, at *1 (M.D.N.C. Jan 10, 2007); *see DeLoach v. Philip Morris Cos.*, No. 00-1235, 2003 WL 23094907, at *3 (M.D.N.C. Dec. 19, 2003) (citing, with approval for this same proposition, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215 (D. Me. 2003)); *see also Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 502 (E.D. Va. 1995) (explaining "[a]lthough the Fourth Circuit has not yet ruled on this issue, the current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases.").

The Fourth Circuit has not established a benchmark for fee awards in common funds cases, but district courts within the Fourth Circuit have noted that most fee awards range from 25 percent to 40 percent of the settlement fund. Percentage-fee awards are exactly what the name suggests – class counsel fees are determined as a percentage of the total settlement fund. This Court has recognized the importance of incentivizing experienced class counsel to take on risky cases. *See, e.g., In re Microstrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d at 788. In fact, a comprehensive study of attorneys' fees in class action cases notes "a remarkable uniformity in awards between roughly 30% to 33% of the settlement amount." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. of Empirical Legal Studies 27, 31, 33 (2004). This holds true even in instances where the class recovery runs into the hundreds of millions of dollars. *See e.g., In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d at 295 (approving award of thirty percent of $220 million); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1136 (W.D. La. 1997) (awarding thirty-six percent of $125 million). *In re Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir.

2002) (approving award of 36% of $3.5 million settlement fund); *Gwozdzinnsky v. Sandler Assoc.*, No. 97-7314, 1998 WL 50368, 159 F.3d 1346 (2d Cir. 1998) (table) (affirming district court's award of 25% of $1 million common fund) (unpublished); *In re Educ. Testing Serv.*, 447 F. Supp. 2d 612, 631 (E.D. La. 2006)(concluding the customary fee award for class actions "is between 22% and 27%"); *In re CMS Energy ERISA Litig.*, No. 02-72834, 2006 WL 2109499, at *1 (E.D. Mich. June 27, 2006) (awarding fee of 28.5% of $28 million settlement fund); *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 995 (D. Minn. 2005) (awarding 25% of $80 million settlement fund); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) (granting attorneys fees in amount of 33 1/3% of $1.5 million settlement fund); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (awarding 33.3% of $3.8 million settlement fund); *Kidrick v. ABC Television & Appliance Rental*, No. 3:97cv69, 1999 WL 1027050, at *1-2 (N.D. W. Va. May 12, 1999) (awarding 30.6% of approximately $400,000 settlement fund, noting that "[a]n award of fees in the range of 30% of the fund has been held to be reasonable. . . . Fees as high as 50% of the fund have been awarded.") (internal citations omitted).

In this case, the Defendant agreed not to oppose Class Counsel's fee requests in the total percentage of 30 % of the full common fund.   As with any class case that they agree to take on, Plaintiffs' counsel live by the result that they obtain for the class members.  In this case, where they bore the risk of the litigation entirely and advanced significant funds in furtherance of the litigation, Class Counsel submits that fee of 30% of the cash recovered for the class is reasonable.  Class Counsel in this case has consistently taken the position in all cases that the attorneys fee should be based on a percentage of the recovery obtained for the class. This has been true even in cases where the result is an objectively small fee such as in *Mayfield v.*

*Memberstrust Credit Union*, 3:07cv506 (E.D. Va. Nov. 7, 2008), where the class size was so small that counsel's fee ended up being $8,300.00, well below the actual time counsel had invested in the case. Indeed, in *Conley v. First Tennessee*, 1:10cv1247 (E.D.Va.), counsel took the same consistent position with respect to a class of 350 consumer and resulted in recovery of an approved fee of only $20,000.00. (Docket No. 37).   The same is true in another case, *Lengrand v. Wellpoint*, No. 3:11Cv333-HEH (Docket No. 42), counsel requested only 20% of the class recovery, $8,550.00, where the class size was very small.  In each case, the standards of Rule 23 demand that Class Counsel represent the interest of the class with the same attention, zeal and competence whether the class is in the hundreds of thousands such as *Ryals v. HireRight Solutions*, or is less than a hundred as in *Lengrand v. Wellpoint*.

Cases such as these with relatively small classes and settlement funds, as well as others that resulted in dismissal or no class outcome, are the necessary context for a petition for a very large fee.  In this litigation as in all class cases, the attorneys who worked on this case have tied their fate to that of the class.  The fee in this case is significant for the simple reason that both the class size and the cash recovery for the class are large.  In addition to the cash that must leave the Defendants for the benefit of the class, Class Counsel in this case also negotiated meaningful reform by BGC.  This symmetry of incentives between counsel and the class motivates Class Counsel to maximize class cash benefit to the largest degree possible.  If a common fund fee is capped at a dollar value instead of a market percentage, there would still be an incentive to take such cases, but there would then be a disincentive to stay the course and litigate through an otherwise low common fund amount.  It must work both ways. One district court explained:

> While it may not instantaneously or completely resolve the problems that currently inhere in this type of litigation, tying the award of attorneys' fees to claims made by class members is one step that judges can take toward repair. This approach will not only encourage more realistic settlement negotiations and

agreements, but also will drive class counsel to devise ways to improve how class action suits and settlements operate. *See* Deborah R. Hensler and Thomas D. Rowe, Jr., *Beyond "It Just Ain't Worth It": Alternative Strategies for Damage Class Action Reform,* 64 Law & Contemp. Probs. 137, 150 (2001) (" 'The single most important action that judges can take to support the public goals of class action litigation is to reward class action attorneys only for lawsuits that actually accomplish something of value to class members and society.' **To this end, ... analysts recommend[ ] that judges award fees based on the actual amounts paid out by defendants to class members, notwithstanding contrary case law." (quoting Deborah Hensler et al., Rand, Class Action Dilemmas: Pursuing Public Goals for Private Gain-Executive Summary 33 (1999))). Class counsel will have an incentive to pay attention to the needs and desires of the class and to "think outside the box" to devise better notice programs, settlement terms, and claim procedures, all to the benefit of the consumers who have been harmed.**

*In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 406 (D. Mass. 2008) (Emphasis added).

In this case, Class Counsel assumed the entire risk of the litigation, appropriately joining forces with co-counsel, staffing the case with experienced attorneys, spending significant time to investigate the case prior to filing, engaging in written and third-party discovery, vigorously litigating, and finally through multiple and exhaustive phone and in-person conversations, the Parties were able to reach this settlement.  Doing so required the litigation of a complex federal case while at the same time attempting to find the terms where the parties might find compromise.  While the fee will be substantial, it has been earned and it is well-deserved because of the excellent outcome achieved by counsel on behalf of the Class.  The risks taken should be compensated, as law recognizes, not only because of the outcome, but because of the substantial investment and risk incurred.  Class Counsel requests a fee of 30% based on their earned percentage of the cash fund obtained.  There is no doubt that the excellent outcome in this case for the Class was the result of risk-taking and really hard work by a group of skilled lawyers.

In this case, and in all cases in which Plaintiffs' counsel will come before this Court, they submit that the proper measure of compensation should be driven by the benefit actually obtained for the class members. Under the circumstances of this case and the applicable law, the Court should award the requested fee of thirty percent of the fund, which is $5,400,000.00.

3.    **A  Cross-Check Of Time Incurred By Attorneys And Paralegals Provides Support For The Requested Fee**

A cross-check is not required to determine the fairness of a fee when the percentage of recovery method is used. However, this Court has on occasion requested information regarding an estimate of Class Counsel's lodestar as a cross-check in determining the percentage of the common fund that should be awarded.  *Manual for Complex Litigation (Fourth)* §  21.724.  Class Counsel have supplied an estimate of their lodestar and expenses, which are $1,334,457.03 in fees, and $ 52,942.98 in total expenses. (Bennett Decl. ¶ 39, 42-43). The Fourth Circuit's decision in *In re Abrams & Abrams, P.A.,* guides the court's assessment of a reasonable multiplier to compensate Plaintiffs' counsel for shouldering the entire burden of accepting a complex case on contingency:

> The chief error in the district court's analysis was its failure to recognize the significance of the contingency fee in this case. The court obviously knew that a contingency fee was involved, but it did not give that fact the weight it was due in the decisional calculus. After quoting language from *Allen* stating that contingency agreements are subject to supervision by courts for reasonableness, 606 F.2d at 435, the court merely stated that it "must consider the other relevant *Barber* factors in order to determine the reasonableness of the contingency fee requested by Plaintiff's Counsel." *Pellegrin,* 598 F.Supp.2d at 728. It then proceeded to apply an hourly rate calculation based on dubious estimations of the applicable hours and rates with no further consideration of the relevance of the contingency fee agreement. *Id.* at 728–30. Fixing a lodestar fee in this contingency case was error and threatens to nullify the considerable advantages of contingency arrangements.

605 F.3d at 245.  As the Fourth Circuit held, the lodestar alone is insufficient to account for the contingency nature of this case and the risk borne by Plaintiffs and their counsel.  Therefore, the

court should find that a multiplier is reasonable.  In this case, and in all cases in which Plaintiffs' counsel will come before this Court, they submit that the proper measure of compensation should be driven by the benefit actually obtained for the class members.

The focus of a fee determination is the benefit for the class.  *Id*. § 21.71 ("compensating counsel for the actual benefits conferred on the class members is the basis for awarding attorney fees. The 'fundamental focus is the result actually achieved for class members.' That approach is premised on finding a tangible benefit actually obtained by the class members.  In comparing the fees sought by the lawyers to the benefits conferred on the class, the court's task is easiest when class members are all provided cash benefits that are distributed.").  In this case, each member of the very large class will receive a cash benefit.  Plaintiff has demonstrated that 30% of the cash fund is appropriate based on the outcome of the case for the benefit of the class, the range that has been found to be appropriate in this court.  Indeed, "empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in the class actions average around one-third of the recovery."  4 Newberg on Class Actions § 14:6 (4th ed.); *see also In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001)(review of 289 class action settlements demonstrates "average attorney's fees percentage [of] 31.31%" with a median value that "turns out to be one-third.").  In an analysis of such historic patterns, Silber and Goodrich explained that empirical evidence doesn't necessarily establish what a court should do in any given case, but it does provide guidance to the court in determining whether a fee is reasonable.  Reagan W. Silber & Frank E. Goodrick, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response,* 17 Rev. Litig. 525, 545-46 (1998).

When the court also looks at the attorneys and the hours they and their law firms expend on a given case, it may give additional support to an award of a fee.  In this case, counsel have provided the estimates of their billable time and expenses with their declarations.

| Law Firm | Lodestar |
|---|---|
| Consumer Litigations Associates, P.C. | $656,606.25 |
| Francis & Mailman | $326,506.50 |
| O'Toole McLaughlin Dooley & Pecora | $190,909.50 |
| Keogh Law LTD | $102,220.00 |
| Consumer & Employee Rights Law Firm | $ 81,775.00 |
| Community Legal Services, Inc. | $ 58,133.00 |

All of the attorneys and law firms entered into this case without an expectation to make a lodestar application.  The time actually expended in this case for important tasks such as answering class member questions and significant time spent strategizing among counsel has never been recorded.  Not all e-mail, telephone calls or simpler work has been included. The requested fee is $5,400,000.00. Therefore, in order to reach the requested fee, the gross multiplier would be 4.05.  Such a multiplier is justified given the contingent nature of the case and the result achieved, but also considering comparable multipliers approved as cross checks in other cases.[13]

A multiplier of 4.05 is well within the range of fairness.  Courts nationwide have – many times over – approved multipliers similar to or larger than the one Class Counsel requests here, sometimes in cases in which much less work was completed.  *See, e.g., In re Charger Commc'n,*

---

[13]     Professor Miller reviewed cases where federal courts used a multiplier to determine whether a multiplier was reasonable, citing cases approving a range of multipliers from 2.5 to 19.6. *See Henderson v. Axciom Risk Mgt.*, Civ. No. 3:12CV589 (E.D. Va. 2014)(Doc. 104-1) (Miller Decl. ¶¶ 32-33).

*Inc., Sec. Litig. No. MDL 1506*, 4:02CV1186CAS, 2005 WL 4045741, at *1, *18 (E.D. Mo. June 20, 2005)(approving lodestar multiplier of 5.61); *In re Excel Energy, Inc., Sec., Derivative & ERISA Litig.,* 364 F.Supp. 2d 980, 989 (D. Minn. 2005)(approving a multiplier of 4.7 in a case that only involved document review, and was resolved without any depositions after two days of mediation); *In re Rite Aid Corp. Sec. Litig.,* 362 F.Supp. 2d 587, 589 (E.D. Pa. 2005)(awarding lodestar multiplier of 6.96 despite the fact that the parties engaged mostly in informal discovery and took no depositions); *Maley v. Del Global Techs. Corp.*, 186 F.Supp.2d 358, 362 (S.D.N.Y 2002)(describing multiplier of 4.65 as "modest" in a case in which plaintiffs conducted no depositions, only interviews, and confirmatory discovery consisted of tens of thousands of pages of documents;); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998)(awarding 3.97 multiplier, reasoning that multipliers between 3 and 4.5 were common); *DiGiacomo v. Plains All Am. Pipeline*, Nos. Civ. H-994137, Civ. H-99-4212, 2001 WL 34633373, at *3, *11 (S.D. Tex. Dec. 19, 2001)(endorsing multiplier of 5.3 despite the fact no depositions were taken and most of the discovery was informal or document review); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002)(affirming multiplier of 3.65 to compensate class counsel for risk of taking the case); *Roberts v. Texaco, Inc.*, 979 F.Supp. 185, 197-98 (S.D.N.Y. 1997)(approving multiplier of 5.5 in what the court described as risky and hard fought litigation); *In re Interpublic Sec. Litig,* 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004)(awarding multiplier of 3.96): *In re WorldCom, Inc., Sec. Litig.*, 388 F.Supp. 2d 319, 353 (S.D.N.Y. 2005)(awarding multiplier of 4).[14]

In *Henderson v. Axciom Risk Management*, another class action settlement currently pending in this court, Class Counsel engaged an expert, Geoffrey P. Miller, to review the fairness

---

[14]    These and other cases, including cases with low, approved multipliers, are attached in table form as Exhibit C.

of the fee requested in that case.   *See Henderson v. Axciom Risk Mgt.*, Civ. No. 3:12CV589 (E.D.Va. 2014)(Doc. 104-1).   In his Declaration, Professor Miller made two observations relevant here.  First, he stated that a percentage fee of 30% is within the range regularly approved by courts in the Fourth Circuit and across the country, which is generally based on the result obtained for the class.  (Miller Decl. ¶ ¶ 23-26, 30-31 and T. 1, T. 2 & T.4).   Next, Professor Miller reviewed court-approved multipliers of lodestar used as a cross-check on the reasonableness of the fee request, and in the *Henderson v. Axciom* case, he opined that a multiplier of 3.05 was "in line" with or below multipliers approved in many other federal courts. (Miller Decl. ¶¶ 32-33).   Though Professor Miller was not engaged for an expert opinion of the fee requested in this case, his general observations and opinions regarding the reasonableness of the percentage of the fund and the cross-check multiplier are applicable here. A multiplier that is 4.05 times counsel's lodestar is "in line" with or below the multipliers cited both in this brief and in Professor Miller's declaration in *Henderson v. Axciom*.

## IV.   CONCLUSION

In summary, the Parties have reached a settlement in this case that provides genuine relief to the class members. In addition, the terms of the Settlement as well as the circumstances surrounding negotiations and its elimination of further costs caused by litigation this case through trial and appeal satisfy the Fourth Circuit's strictures for final approval. The Plaintiff respectfully moves the Court to grant his motion for final approval of this settlement and award the service payment and attorneys' fees and costs as requested herein.

Respectfully submitted,

**KELVIN THOMAS**
*on behalf of himself and*
*all others similarly situated,*

By_____/s/_____

| | |
|---|---|
| Leonard A. Bennett, VSB 37523<br>Consumer Litigation Associates, P.C.<br>763 J. Clyde Morris Boulevard, Ste 1-A<br>Newport News, Virginia 23601<br>(757) 930-3660 – Telephone<br>(757) 930-3662 – Facsimile<br>E-mail: lenbennett@clalegal.com | Dale Wood Pittman<br>The Law Office of Dale W. Pittman, P.C.<br>112-A W Tabb St<br>Petersburg, VA 23803-3212<br>(804) 861-6000 - Telephone<br>(804) 861-3368 - Facsimile<br>Email: dale@pittmanlawoffice.com |
| Susan M. Rotkis VSB 40693<br>Consumer Litigation Associates, P.C.<br>763 J. Clyde Morris Boulevard, Suite 1-A<br>Newport News, Virginia 23601<br>(757) 930-3660 - Telephone<br>(757) 930-3662 – Facsimile<br>E-mail: srotkis@clalegal.com | James A. Francis<br>David A. Searles<br>John J. Soumilas<br>**FRANCIS & MAILMAN PC**<br>Land Title Building<br>100 S. Broad Street, 19th Floor<br>Philadelphia PA 19110 |
| Matthew James Erausquin<br>Consumer Litigation Associates PC (Alex)<br>1800 Diagonal Rd<br>Suite 600<br>Alexandria, VA 22314<br>703-273-6080 - Telephone<br>1-888-892-3512 - Facsimile<br>Email: matt@clalegal.com | Christopher Colt North<br>**THE CONSUMER & EMPLOYEE RIGHTS LAW FIRM, P.C.**<br>751-A Thimble Shoals Boulevard<br>Newport News, VA 23606<br>cnorthlaw@aol.com<br>Phone: (757) 873-1010<br>Fax: (757) 873-8375 |
| Casey Shannon Nash<br>Consumer Litigation Associates PC (Alex)<br>1800 Diagonal Rd<br>Suite 600<br>Alexandria, VA 22314<br>703-273-7770 - Telephone<br>1-888-892-3512 - Facsimile<br>Email: casey@clalegal.com | Matthew A. Dooley<br>Anthony R. Pecora<br>O'Toole, McGlaughlin, Dooley & Pecora Co, LPA<br>5455 Detroit Rd.<br>Sheffield Village, OH 44054<br>Tel: 440-930-4017<br>Fax: 440-934-7208<br>Email: mdooley@omdplaw.com<br>Email: apecora@sheffieldlaw.com |
| Sharon M. Dietrich<br>Community Legal Services, Inc.<br>1424 Chestnut St.<br>Philadelphia, PA  19102<br>(p) 215-981-3719<br>(f)  215-981-0434<br>Email:  sdietrich@clsphila.org<br><br>*Counsel for Plaintiff* | Keith J. Keogh<br>Keogh Law LTD<br>55 W. Monroe Street, Ste. 3390<br>Chicago, IL 60603<br>Tel: 312-374-3403<br>Fax: 312-726-1093<br>Email: keith@keoghlaw.com |

|  |  |
|--|--|
|  |  |

## CERTIFICATE OF SERVICE

I hereby certify that on 17th day of July 2015, I filed a true and correct copy of the foregoing on the Court's CM/ECF System, which will send a notice of electronic filing to all counsel of record, including:

| | |
|--|--|
| Charles K. Seyfarth, Esq.<br>LECLAIR RYAN PC<br>Riverfront Plaza - East Tower<br>951 E Byrd St<br>Richmond, VA 23219<br>Telephone: (804) 916-7159<br>Facsimile:  (804) 916-7259<br>charles.seyfarth@leclairryan.com<br><br>Megan S. Ben'Ary, Esq.<br>LECLAIR RYAN PC<br>2318 Mill Road. Suite 1100<br>Alexandria, VA 22314<br>Telephone: (703) 647-5933<br>Facsimile:  (703) 647-5983<br>megan.benary@leclairryan.com | Cindy Dawn Hanson<br>Kilpatrick Stockton LLP<br>1100 Peachtree St<br>Suite 2800<br>Atlanta, GA 30309<br>Email: chanson@kilpatrickstockton.com<br><br>John Phillip Jett<br>Kilpatrick Townsend & Stockton LLP<br>1100 Peachtree St<br>Suite 2800<br>Atlanta, GA 30309-4530<br>Email: jjett@ktslaw.com<br><br>Ross Dallas Andre<br>Kilpatrick Townsend & Stockton LLP<br>1100 Peachtree St<br>Suite 2800<br>Atlanta, GA 30309-4530<br>(404) 815-6500<br>Email: randre@ktslaw.com |

_____/s/_____
Susan M. Rotkis
VSB 40693
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
E-mail:  srotkis@clalegal.com